UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LAKE CASCADE AIRPARK, LLC, an Idaho limited liability company; DONALD MILLER and CANDACE W. MILLER, husband and wife,<br><br>            Plaintiff,<br><br>    v.<br><br>NORTHWEST FARM CREDIT SERVICES, FLCA, a federally chartered Instrumentality of the United States of America,<br><br>            Defendant. | Case No. 1:14-cv-240-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for summary judgment filed by defendant Northwest Farm Credit Services, and a motion for partial summary judgment filed by plaintiffs. The motions were argued on March 3, 2015, and taken under advisement. For the reasons explained below, the Court will (1) grant plaintiffs' motion for partial summary judgment and strike FCS's defense that the plaintiffs are not entitled to the right of first refusal because they could have avoided foreclosure; and (2) grant in part FCS's motion for summary judgment, dismissing the Millers from the case and dismissing Count V of the complaint. The remainder of FCS's motion is denied.

**Memorandum Decision & Order – 1**

# FACTUAL BACKGROUND

Plaintiff Donald and Candice Miller formed Lake Cascade Airpark LLC with David and Karen Buich to develop an airpark near the Cascade Reservoir in Idaho. They obtained two loans from defendant Northwest Farm Credit Services ("FCS"), secured by a mortgage on real property. One loan was for $2.45 million and the other was for $500,000 in the form of a line of credit.

The Millers and Buiches agreed between themselves to split the monthly payments so that each would pay about $9,000. They made their payments for two years, until the Buiches went through a divorce in 2010 and stopped paying their share. Over the next two years the Millers negotiated with FCS, but FCS eventually foreclosed in 2012 and acquired the real property. FCS obtained a deficiency judgment against the Millers, Buiches, and Lake Cascade Airpark in the amount of $2,135,580.16. Shortly thereafter, FCS settled with the Buiches for $25,000 and pursued the Millers for the remainder of the deficiency judgment.

Those proceedings are not in dispute here. What is disputed is whether FCS had the right, after acquiring the property, to lease it to a third party without giving the Millers the right of first refusal to the same lease arrangement.

# ANALYSIS

The Millers allege that their loan agreement gives them a right of first refusal. It is undisputed that the Farm Credit Act of 1971, as amended by the Agricultural Act of 1987, 12 U.S.C. § 2001, *et seq.*, governs the loans at issue here and grants to the borrower a first right of refusal to any lease or sale of the land foreclosed upon and acquired by the

**Memorandum Decision & Order – 2**

lender. *See* 12 U.S.C. §2219a(c)(1). It is also undisputed that there is no private right of action under the Act, and that "Congress intended administrative review to be the exclusive remedy." *Harper v. Federal Land Bank of Spokane,* 878 F.2d 1172, 1176 (9th Cir. 1989).

Thus, the Millers clearly had a *statutory* right of first refusal that could be enforced only administratively – the issue is whether they also had a *contractual* right of first refusal that could be enforced here.

The answer to that issue depends on the following language that appears in the Loan Applications:[1]

> **Customer Rights** - If the customer is a farmer [or] rancher . . . with a loan as defined under the Farm Credit Act of 1971 . . . , this loan is subject to the rights as set forth therein, including but not limited to the following:
> **Interest Rate Review** (Section 2199) - If you have questions about the interest rate charged for your loan, you have the right upon request to: (1) a review of the loan to determine that the proper interest rate has been assigned; (2) a written explanation of the interest rate charged; and (3) a written explanation of how your credit status may be improved to receive a lower rate.
> **Restructure Application and Notice of Action on Application** (Section 2201-2202c) - FCS may not commence loan foreclosure unless at least 45 days before such commencement, FCS has provided the customer with a copy of the distressed loan restructuring policy and forms on which the customer may submit a request for distressed loan restructuring. FCS shall provide prompt written notice of action taken on loan and restructure applications, including notice of a right to a credit review committee hearing if the loan or restructure application is denied or if the loan application is reduced. A copy of the Distressed Loan Restructuring Policy is available upon request.
> **Miscellaneous** (Section 2202d, e) - FCS may not foreclose on any loan because of the customer's failure to post additional collateral if the

---
[1] There is no dispute that these Loan Applications are part of the agreement between the parties.

> customer has made all accrued payments of principal, interest and penalties. FCS may not require a reduction in outstanding principal balance which exceeds the regularly scheduled principal installment except in limited circumstances. If the customer pays all accrued payments, including penalties, FCS may not enforce acceleration of the loan based solely on the customer's untimely payments. FCS may not require a customer who has pledged agricultural property to waive any state mediation rights.
>
> **Right of First Refusal** (Section 2219a) - When FCS first elects to sell or lease agricultural real property it has acquired and of which the customer was the prior record owner, FCS must first notify the customer of the customer's right to purchase or lease the property for a price or rental rate equal to its appraised fair market value or appraised fair rental value, as appropriate.

*See Exhibits A & D to Complaint (Dkt. No. 1).* FCS argues that this contractual language is not part of the contract but is simply notice that the Farm Credit Act governs the loans. In support of this argument, FCS cites *Burgmeier v. Farm Credit Bank of St. Paul*, 499 N.W.2d 43 (Minn.App.Ct. 1993). In that case, the mortgage stated that it was "subject to" the Farm Credit Act. The court held that "[t]his language alone is insufficient to create rights or obligations in the parties and cannot support a breach of contract action." *Id.* at 47; *see also Production Credit Ass'n v. Van Iperen*, 396 N.W.2d 35, 38 (Minn.App.1986) (holding that language in loan agreement "governed by the Farm Credit Act of 1971 and its regulations" did not create a cause of action for breach based upon violations of the Act).

The Millers respond by citing *State ex.rel. Farm Credit Bank of Spokane v. Dist.Court of Third Judicial Dist.,* 881 P.2d 594, (Mont.Sup.Ct. 1994). In that case, the loan agreement contained the following language:

> This mortgage and the note secured hereby are executed and delivered under and in accordance with the Farm Credit Act of 1971 and any Acts amendatory or supplementary thereto and the regulations of the Farm

**Memorandum Decision & Order – 4**

>Credit Administration, and are subject to the terms, conditions and provisions thereof applicable to Federal Land Bank loans.

*Id.* at 599. The court interpreted this language to create a contract right: "By including reference to the Act as a controlling contract term, the [lender] is bound by the terms of the Act under the contract, and the [borrowers] have the same right to enforce the provisions of the Act as the parties have to enforce any other provision in the contract." *Id.* at 603. It was important to the court's analysis that the lender drafted the language and could have made express its intent to exclude contract rights: "If the [lender] had intended to allow only [administrative enforcement under the Act] it could have deleted any reference to the Act . . . ." *Id.*

These cases from Montana and Minnesota are obviously not binding upon the Court. Indeed, it is Washington law that, according to the loan agreement, shall "govern the construction and enforcement of this Agreement." *See Exhibit F (Dkt. No. 1-2)* at ¶ 14.

Washington law provides that a contract is ambiguous if it is "subject to two or more reasonable interpretations." *See Jensen v. Lake Jane Estates*, 267 P.3d 435 (2011). Whether a contract is ambiguous is a question of law for the courts to resolve. *General Ins. Co. of America v. Icelandic Builders, Inc.,* 604 P.2d 966 (Wash.App.Ct. 1979). If a court determines that a contract is ambiguous, the jury must resolve the ambiguity.[2] *Hensel Phelps Const. Co. v. King County,* 787 P.2d 58, 62 (Wash.App.Ct. 1990). And in

---

[2] Plaintiffs have demanded a jury trial in this case. *See Complaint (Dkt. No. 1-2)*

resolving that ambiguity, jurors "generally construe ambiguities against the contract's drafter." *Viking Bank v. Firgrove Commons 3, LLC,* 334 P.3d 116, 120 (Wash.App.Ct. 2014).

Under these standards dictated by Washington law, the Court turns first to determine whether the contract is ambiguous – that is, whether it is subject to two reasonable but conflicting interpretations. FCS's reading – that the contract language merely notifies borrowers of statutory rights and does not create contract rights – is certainly one reasonable interpretation. The "Customer Rights" paragraph cites to the Act and states that the "loan is subject to the rights as set forth *therein*" – using the term "therein" refers the reader back to the Act, and signals that the listed customer rights are statutory in origin. Moreover, each listed customer right is prefaced with a citation to the specific statutory section on which it is based. This appears to be a noble attempt on the part of FCS to explain statutory rights in plain English, rather than to create contractual rights.

But the Millers' contrary interpretation is equally reasonable. In describing the borrowers' rights, FCS went far beyond the terse phrasing of the Minnesota cases discussed above, which merely stated the loans were "subject to" or "governed by" the Act. Instead, FCS described in detail and at length the rights granted by the Act. Importantly, FCS did not just quote from the Act but reworded the statutory language and applied the lender duties specifically to itself. For example, the language under the heading "Right of First Refusal" does not use the statutory language referring to the lender ("institution of the System") but instead refers directly to FCS: "When FCS first

Memorandum Decision & Order – 6

elects to . . . lease agricultural real property . . . FCS must first notify the customer of the customer's right to . . . lease the property . . . ." Moreover, this contractual language does not quote directly from the Act but paraphrases the statutory language.

A borrower, reading this language, could reasonably conclude that these provisions create contract rights. FCS could have easily prevented such a reading by including a short sentence that the language does not create any contractual rights, but no such exclusion was included.

Because there are two reasonable yet conflicting interpretations possible, the Court finds as a matter of law that the contract is ambiguous. Thus, a jury must resolve the ambiguity.

FCS argues that a Washington court has already resolved this issue in *Interstate Production Credit Association v. MacHugh,* 810 P.2d 535 (Wash.App.Ct. 1991). But that decision is silent on whether any language in the loan agreement incorporated the Act, or whether any such language even existed, and there is accordingly no analysis whatsoever of any possible ambiguities. *MacHugh* offers no insight here.

For all these reasons, the Court finds that because the contract language is ambiguous as to whether it creates contractual rights or merely recites statutory rights, FCS's motion for summary judgment on this issue is denied.

**Material Breach & Right of First Refusal**

FCS argues that by defaulting, the Millers are in material breach of the contract and therefore have lost the right to exercise the right of first refusal. This argument ignores the fact that the right of first refusal is only triggered upon a material breach. Far

**Memorandum Decision & Order – 7**

from being *lost* by a material breach, the right of first refusal is actually *created* by a material breach. The Court therefore finds this argument lacks merit.

## Exhaustion of Administrative Remedies

FCS argues that the Millers failed to exhaust their administrative remedies before filing suit. But the Court has just held that there are questions of fact over whether the right of first refusal is a contract right. If it is, and if the contract contains only those provisions cited in the contract, there is no exhaustion requirement in the contract. The Court need not decide here the full scope of the contract – it is enough to say that questions of fact exist that will have to be resolved by a jury and preclude summary judgment on this issue.

## The Millers as "Prior Record Owners"

FCS argues that the right of first refusal only applies to "prior record owners" of the real property at issue, and that the Millers have never been record owners of that land. It is undisputed that the Millers were not record owners of the real property, which was owned instead by plaintiff Lake Cascade Airpark LLC.

The Millers argue that FCS is depending on statutory language and ignoring its contractual rights. Not so – FCS is depending entirely on the contract language for this argument. The contract states that FCS must give a first right of refusal to a customer when "the customer was the prior record owner." The Millers were certainly "customers" of FCS but they were not "prior record owners" and so they do not share the right of first refusal with Lake Cascade Airpark LLC. The Court will therefore grant this portion of FCS's motion for summary judgment.

**Memorandum Decision & Order – 8**

**Millers' Ability To Avoid Foreclosure**

FCS seeks summary judgment on its defense that because the plaintiffs had the financial resources to avoid foreclosure, they cannot take advantage of the right of first refusal. FCS argues that evidence submitted by plaintiffs during their loan negotiations shows conclusively that they had the financial resources to avoid foreclosure. The plaintiffs respond that FCS is judicially estopped from asserting this defense because they obtained the foreclosure by asserting that the loans were distressed and that the plaintiffs had no ability to repay the loans.

This dispute resolves itself, without the need for any analysis, under two possible scenarios. In the first, if the jury finds that the right of first refusal is not a contract right, the dispute is moot because FCS prevails without even invoking the defense. In the second, if the jury finds that the right of first refusal is a contract right, and is limited narrowly to the language of the contract, the defense must be struck because the contract language contains no such defense. There is again no need to inquire into the substance of FCS's defense or plaintiffs' claim of judicial estoppel.

It is only in a third scenario that the Court must confront the substance of the dispute – that scenario would arise if the jury finds that the right of first refusal is a contract right, and that the terms of the contract include all the terms of the Act. The Act clearly includes FCS's defense. *See* 12 U.S.C. § 2219a. Because one of the plaintiffs'

contentions is that the contract terms contain all the statutory provisions of the Act, the Court will resolve this dispute under that scenario.[3]

The Court will turn first to plaintiffs' argument that FCS is barred from asserting this defense by the doctrine of judicial estoppel. Washington law holds that this is a question of law to be resolved by the Court. *See Anfinson v. FedEx Ground Package System, Inc.,* 281 P.3d 289 (Wash.Sup.Ct. 2012) (resolving judicial estoppel issue as a matter of law).

Judicial estoppel precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. *Id.* at 294. There are two primary purposes behind the doctrine: preservation of respect for judicial proceedings and avoidance of inconsistency, duplicity, and waste of time. *Id.* at 294-95. Three factors guide courts in applying judicial estoppel: (1) whether the party's later position is "clearly inconsistent" with its earlier position, (2) whether acceptance of the later inconsistent position "would create the perception that either the first or the second court was misled," and (3) whether the assertion of the inconsistent position would create an unfair advantage for the asserting party or an unfair detriment to the opposing party. *Id.* at 295.

Before applying these factors, the Court will review the pertinent facts. It is undisputed that on July 28, 2010, FCS deemed the Millers' loans to be "distressed loans"

---

[3] Plaintiffs argue that the right of first refusal is defined entirely by the contract language without reference to the Act *or in the alternative* that it is defined by all the terms of the Act.

under 22 U.S.C. § 2202a(a)(3). That statute defines a "distressed loan" to be one that "the borrower does not have the financial capacity to pay." *Id.*

After receiving that notice from FCS that their loans were "distressed," the Millers sought to restructure the loans to (1) take the Buiches off the loans; (2) reduce the monthly payments by $9,000 per month, the amount the Buiches had been paying; and (3) add additional security to the loan with additional land. *See Miller Affidavit (Dkt. No. 20-2)* at ¶ 17. In an attempt to persuade FCS to accept this restructuring, the Millers provided financial data to FCS showing that they had substantial wealth. For example, their balance sheet in 2010 showed total assets of $65,701,000 and total liabilities of $5,316,000, for a net worth of $60,385,000. In addition, the Millers' Projected Cash Flow Analysis dated January 18, 2011, showed February through December 2011 income of $1,037,000 and debt payments of $599,696. *See, Affidavit of Ron Kerl (Dkt. No. 13-3)* at Exhibit J.

FCS reviewed the Millers' financial data and restructuring plan, but ultimately was not persuaded. In December of 2011, FCS accelerated the loans and then filed a complaint for foreclosure in State Court. In that complaint, FCS represented that "[t]hat all conditions precedent to the initiation and prosecution of the suit on said Note and Loan Agreement and foreclosure of said Mortgage have been satisfied."

That was an important representation because the plaintiffs had rights that needed to be "satisfied" before the foreclosure could go forward. *See* 22 U.S.C. § 2202a(b)(3) (stating that "[n]o qualified lender may foreclose or continue any foreclosure proceedings with respect to any distressed loan before the lender has completed any pending

consideration of the loan for restructuring"). Those borrower rights were triggered when FCS declared the Millers' loans to be "distressed loans." *Harper v. Federal Land Bank of Spokane,* 878 F.2d 1172, 1174 (9th Cir. 1989) (holding "that one of the purposes of the Act was to provide borrowers with certain limited rights, including the right to restructure distressed loans and the right of first refusal by the previous owner when the lenders elect to sell acquired property").

The foreclosure could not proceed unless these rights were recognized. By representing to the State Court that "all conditions precedent" to foreclosure were "satisfied," FCS was representing that (1) the Millers' loans were distressed loans as that term is defined by § 2202a(a)(3); (2) that FCS had considered any restructuring proposals as required by §§ 2202a(d)(1); 2202c(a); and (3) that pursuant to § 2202a(b)(3) it had "completed any pending consideration of the loan for restructuring under this section."

In other words, FCS was representing that the Millers "[did] not have the financial capacity to pay." *See* 22 U.S.C. 2202a(a)(3). FCS now comes to this Court and argues just the opposite – that the Millers did have a capacity to pay. Having obtained a benefit in the State Court making one representation, FCS now seeks to obtain another benefit in this Court with the opposite representation.

FCS responds that its determination that the loans were distressed was based on a "snapshot of the information available to it on July 28, 2010," and that the Act does not require it to later make a "redetermination that the loans were no longer distressed," especially when the Millers were making no payments. *See FCS Brief (Dkt. No. 27)* at pp. 2, 8. If FCS means that it can internally withdraw its "distressed" determination

**Memorandum Decision & Order – 12**

without formal action, the Act states otherwise. The Act requires FCS to "document such change of status and promptly notify the borrower thereof in writing of such actions and the reasons therefor." *See* 12 U.S.C. § 2202d(d)(1).

The reason for this is obvious. If the foreclosure is proceeding on a distressed loan, the borrower assumes he will have a right of first refusal. If part-way through the process, the lender finds that the borrower has the resources to avoid foreclosure but is nevertheless withholding payments, the lender must notify the borrower (and document the finding) so that the borrower recognizes that *he is losing the right of first refusal on foreclosure*. Without that notice, the borrower is misled – he believes that the foreclosure is proceeding on a distressed loan and that he will have a right of first refusal. The Act does not allow the lender to ambush the borrower by secretly switching a loan from distressed status to nonaccrual status, stripping the borrower of his right of first refusal, and hiding this loss of rights from the borrower.

In this case, there is no evidence presented by FCS that it documented any change in the "distressed" status of the loans or provided written notification to the plaintiffs. This misled the plaintiffs into believing that they would have the first right of refusal when the foreclosure was complete.

FCS argues that it never represented to the State Court that the loans were distressed or that plaintiffs did not have the financial resources to pay off the loans. In essence, FCS argues that the State Court was not misled and that judicial estoppel does not apply.

**Memorandum Decision & Order – 13**

But if FCS had informed the State Court of the very argument they make here – that plaintiffs had the ability to avoid foreclosure – FCS would not have been permitted to proceed with the foreclosure because it had failed to comply with the requirements of § 2202d(d)(1), discussed above. In that sense, FCS's statement to the State Court that it had "satisfied" all conditions precedent to foreclosure was not accurate. Judicial estoppel is therefore applicable, and the Court will grant plaintiffs' motion for partial summary judgment.

**Breach Claims & Implied Covenant of Good Faith and Fair Dealing**

FCS argues that the breach of contract claims, including the claim for breach of the implied covenant of good faith and fair dealing, and the claim for equitable estoppel, must be dismissed because there is no contract. But the Court has held above that there is a contract, and so these claims are not subject to summary judgment.

**Claim For Injunction Against State Court Judgment**

In Count V of the complaint, the Millers ask the Court to enjoin the Idaho State Court from enforcing the final deficiency judgment of $2,135,383.16. The Anti-Injunction Act, 28 U.S.C. § 2283, forbids this Court from enjoining state court proceedings. This prohibition covers the collection of state court judgments. *See* 17A, *Federal Practice & Procedure,* § 4222 (3d ed. 2014). Accordingly, the Court will grant FCS's motion for summary judgment on this issue.

**Conclusion**

For the reasons expressed above, the Court will (1) grant plaintiffs' motion for partial summary judgment and strike FCS's defense that the plaintiffs are not entitled to

Memorandum Decision & Order – 14

the right of first refusal because they could have avoided foreclosure; and (2) grant in part FCS's motion for summary judgment, dismissing the Millers from the case and dismissing Count V of the complaint.  The remainder of FCS's motion is denied.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the plaintiffs' motion for partial summary judgment (docket no. 25) is GRANTED, and that Northwest Farm Credit Services' defense that plaintiffs are not entitled to the right of first refusal because they could have avoided foreclosure is DISMISSED.

IT IS FURTHER ORDERED, that the motion for summary judgment (docket no. 13) filed by defendant is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to dismiss Donald Miller and Candace W. Miller as plaintiffs, and to dismiss Count V of the complaint.  It is denied in all other respects.

DATED: April 16, 2015

B. Lynn Winmill
Chief Judge
United States District Court